IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| In re the Matter of the Parentage and Support of | No.  48414-5-II |
| AUBREY VANETA JOHNSON, | |
| Child, | |
| JENNIFER CHRISTINE JOHNSON, | |
| Respondent, | |
| v. | |
| TIMOTHY WAYNE JOHNSON, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Timothy Johnson appeals from a parenting plan concerning his child, Aubrey Johnson, that allotted the majority of her residential time and nonemergency health care and education decision-making authority to the mother, Jennifer Johnson.  Timothy[1] argues that the trial court abused its discretion when it (1) allocated the majority of Aubrey's residential time to Jennifer under RCW 26.09.187(3), (2) granted health care and decision-making authority to Jennifer under RCW 26.09.187(2), and (3) declined to limit the parenting plan based upon Jennifer's (a) alleged abusive use of conflict and (b) fiancé's posting pornographic content on his

---

[1] We use the first names of the parents and the child for clarity.

social media. Because the trial court did not abuse its discretion, we reject these arguments. Accordingly, we affirm.

FACTS

I. BACKGROUND

In December 2010, Aubrey was born to Timothy and Jennifer, who separated in 2014. After the separation, Jennifer petitioned to establish Aubrey's residential schedule. Each parent ultimately requested that Aubrey reside with him or her for the majority of the time, with Timothy seeking additional restrictions that would prevent Aubrey's proximity to Jennifer's fiancé, Jeromy Maxwell. Pretrial, the trial court ordered a shared, equal residential schedule.

II. TRIAL TESTIMONY

A. JENNIFER'S EVIDENCE

1. GUARDIAN AD LITEM'S TESTIMONY

Sheri Nakashima, Aubrey's guardian ad litem (GAL), recommended continuing the equal residential schedule with some changes to avoid contact between Jennifer and Timothy. Once Aubrey began elementary school, Nakashima recommended Jennifer's designation as "the primary caretaker" because of Jennifer's greater availability, but that Timothy be allocated "a very generous schedule." 1 Report of Proceedings (RP) at 32.

Nakashima testified that Timothy had been a contributing factor to at least one conflict. In September 2015, Jennifer had learned that Timothy did not have a valid driver's license when Timothy sought to transport Aubrey. Timothy had refused to show his license to Jennifer in order to resolve the conflict. Nakashima believed that Jennifer's concerns were reasonable, although

Nakashima acknowledged that it would have been better for Jennifer to resolve the driver's license issue with Timothy beforehand.

Shortly before trial, Timothy alerted Nakashima to pornographic content posted on Maxwell's social media. The content, which consisted of explicit videos and photographs intermingled with photographs of Maxwell's children and was open to public view, was concerning to Nakashima. Nakashima conducted an unannounced visit to Jennifer and Maxwell's home, where Nakashima did not find any "pornographic tapes or anything of that nature." 1 RP at 55. Based upon her concerns, Nakashima recommended that Maxwell not have any contact with Aubrey "until the Court has a better idea or I have a better idea [of] what's going on." 2 RP at 128.

Nakashima testified that both parents were "very engaged" and "did really well with Aubrey" and that Timothy "really loves his child." 2 RP at 134. Nakashima noted Timothy's use of a parenting coach and that Timothy had continued to attend these sessions not because he had deficient parenting skills but because he sought to improve his existing parenting skills. Jennifer and Timothy had conflicting accounts of who had "done . . . the housework" during their relationship and whether Jennifer and Timothy had agreed that Timothy would be "a stay-at-home dad." 1 RP at 49.

2. JENNIFER'S TESTIMONY

Jennifer testified that she had been the family's "sole provider" and had worked continuously from when Aubrey was a few weeks old. 3 RP at 221. For a few weeks in early 2012, when the family moved to Port Angeles, Jennifer brought Aubrey with her to work every day. Otherwise, while in Port Angeles, Timothy would watch Aubrey except on days that Timothy

had outpatient "rehab" when Aubrey would be placed in day care or on days when Timothy's family would watch Aubrey. On Jennifer's days off, Jennifer, Timothy, and Aubrey did family activities together.

Around March 2013, Jennifer transferred to work in Bellingham; during the following year, Timothy did not work and was entirely responsible for watching Aubrey. Jennifer indicated that in Bellingham, Timothy had stayed at home with Aubrey not by agreement but because Timothy had been unable to find other employment. Jennifer explained that Timothy had not taken over any household responsibilities while Jennifer had worked and that Jennifer had brought home dinner, bathed and put Aubrey to bed, and cleaned the home. Jennifer stated that she and Timothy "had a rocky relationship" and that she wished to leave Timothy but that she feared Timothy would take Aubrey away from her. 3 RP at 220. Jennifer testified that Timothy had threatened that if she ever left him, Jennifer would "never see Aubrey again," a threat that Jennifer feared Timothy would carry out when, after Jennifer and Timothy took a "break" from their relationship, Timothy left the home and took Aubrey with him. 3 RP at 220. Jennifer admitted that she had withheld Aubrey from Timothy for approximately nine days after Jennifer filed her petition.

Jennifer also testified about the parties' communication difficulties. She explained that Timothy had once denied having a conversation with her, so that afterward, Jennifer communicated with Timothy only by text message. Timothy would "communicat[e]" with her to change the exchange location or "if there's something going on with him," but Timothy had "never" told Jennifer that he moved to Kent. 3 RP at 218, 217. Timothy and Jennifer could not agree on a preschool, and Timothy refused without explanation to allow Aubrey to attend counseling.

4

In July 2014, Jennifer ceased working due to a workplace injury; she did not plan to return to work, and at the time of trial, she lived with Maxwell and his children, including her son with Maxwell. Jennifer detailed her post-separation time with Aubrey, including her routine of making meals with Aubrey, teaching Aubrey her alphabet and numbers, having playtime together with Aubrey, and reading bedtime stories to Aubrey. Aubrey enjoyed playing with Maxwell's children and helping to care for her half-sibling.

On cross-examination, Jennifer acknowledged that she had been charged with assaulting a prior boyfriend, although the case had been dismissed, and that when she was 12 years old, her father had left her at Child Protective Services after something "sexual" happened. 3 RP at 259. Although she agreed that the pornographic photographs on Maxwell's website were inappropriate, she had never witnessed Maxwell viewing pornography.

3.    MAXWELL'S TESTIMONY

Maxwell admitted that he had taken pornographic photographs of himself but claimed that he had not posted those photographs and that they had "auto synched" from his cellphone and been "auto categorize[d]" into certain groups based on their pornographic content. 2 RP at 170. He was "shocked" to find out that pornographic content "was open or available to be viewed by anyone" on his websites and was in the process of removing all the content. 2 RP at 158.

B.  TIMOTHY'S EVIDENCE

Timothy claimed that it was a "joint idea" for him to be a "stay-at-home dad" and that within a few months of Aubrey's birth, Timothy took over Aubrey's primary care.[2] 3 RP at 305.

---

[2] Timothy also disputed Jennifer's testimony about how often Jennifer had brought Aubrey to work immediately after the family moved to Port Angeles in 2012.

However, Timothy worked for a few months in late 2011 and worked full time and had outpatient "rehab" treatment[3] between 2012 and 2013; when Timothy was in treatment, Aubrey would be in day care. During the period that the family lived in Port Angeles, Timothy's family assisted in caring for Aubrey, but when the family moved to Bellingham in 2013, Timothy exclusively cared for Aubrey. Timothy disputed Jennifer's claim that Jennifer brought the family food "all the time" during this period. 4 RP at 402.

After the separation, Timothy held various jobs from May to December 2014. Beginning in April 2015, Timothy shared an apartment in Kent with his brother and sister and worked from 7:00 AM to 3:30 PM on weekdays; on workdays, Timothy left Aubrey with a babysitter. On weekends, Timothy brought Aubrey to visit his parents in Port Angeles, where she had at least one playmate. Timothy explained that Aubrey engaged "pretty well" "with everybody" in Timothy's environment. 4 RP at 401.

Timothy testified that he did not know that his driver's license was invalid until Jennifer told him in September 2015. He had e-mailed Jennifer in August with a proposed preschool for Aubrey, but Jennifer had not responded; Timothy could not recall the last time that he and Jennifer had spoken to each other. Timothy claimed that Jennifer had not asked Timothy about counseling for Aubrey but that he would have objected to such a request.

Timothy's parenting coach and his sister also testified. The parenting coach had met with Timothy 30 times, had provided suggestions including how to make exchanges easier, and opined

---

[3] This treatment was related to a 2008 driving while under the influence (DUI) conviction; Timothy admitted that he had not taken his 2008 DUI and reckless driving charges seriously at first but stated that he had eventually completed a year-long treatment program in 2013 and no longer consumed alcohol.

that Timothy and Aubrey had a "deep trusting attached relationship." 4 RP at 434. The parenting coach noted that Port Angeles, where Timothy's parents lived, was a "place of community" for Aubrey. 4 RP at 451. Timothy's sister, Trisha Johnson, described the driver's license incident at a September 2015 exchange and the living situation in Kent, including that she shared a bedroom with Aubrey when Aubrey resided with Timothy. According to Timothy's sister, she and Aubrey were "'[b]est friends.'" 5 RP at 510.

### III. TRIAL COURT'S RULING

Following trial, the trial court examined each of the seven factors from RCW 26.09.187(3)(a) on the record. After weighing the factors, the trial court concluded that Jennifer would have sole education and nonemergency health care decision-making authority and that once Aubrey began kindergarten, Jennifer would be allocated the majority of time with Aubrey.

The trial court subsequently entered written findings, including that the parties "do not have the current ability to communicate, except by text" and that the inability to communicate except by text was "harmful parental conduct." Clerk's Papers (CP) at 7. The trial court found that "[t]he parties have a history of co-parenting while together and parallel parenting afterwards. [Timothy] did not take greater responsibility for care of the child and relied upon others to assist." CP at 7. Finally, Timothy worked, utilized a babysitter during the week, and had a "history of consistent employment," while Jennifer "is not working, does not intend to return to work[,] . . . and has more flexibility."[4] CP at 7.

Timothy appeals the trial court's parenting plan order.

---

[4] The trial court also denied Timothy's reconsideration motion.

ANALYSIS

I. LEGAL PRINCIPLES

We review a trial court's parenting plan for an abuse of discretion; the trial court's discretion in this area is "broad." *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion where its decision is manifestly unreasonable or based upon untenable grounds or reasons. *Katare*, 175 Wn.2d at 35.

Unchallenged findings of fact are verities on appeal, and we uphold challenged findings of fact so long as they are supported by substantial evidence. *In re Marriage of Fiorito*, 112 Wn. App. 657, 665, 50 P.3d 298 (2002); *Katare*, 175 Wn.2d at 35. Substantial evidence is "that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." *Katare*, 175 Wn.2d at 35. So long as substantial evidence supports a finding, it is immaterial that other evidence may contradict the finding. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

When a trial court fashions a parenting plan, its discretion must be guided by the following statutes: RCW 26.09.187(3)(a), which enumerates factors to be considered; RCW 26.09.184, which sets forth the objectives of the permanent parenting plan and the required provisions; RCW 26.09.002, which declares the Parenting Act of 1987's policy; and RCW 26.09.191, which sets forth factors that require or permit limitations upon a parent's involvement with the child. *Katare*, 175 Wn.2d at 35-36. An appellate court is extremely reluctant to disturb child placement decisions because of the trial court's unique opportunity to observe the parties. *In re Parentage of Schroeder*, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

## II.  RCW 26.09.187(3)(a) BALANCING

Timothy raises several challenges to the trial court's findings of fact underlying its balancing of RCW 26.09.187(3)(a)'s factors and argues that the trial court abused its discretion when it weighed the factors and designated Jennifer as the "primary residential parent."  Br. of Appellant at 3.  Because substantial evidence supports the challenged findings of fact and because the findings support the trial court's legal conclusion, we hold that the trial court did not abuse its discretion.

RCW 26.09.187(3)(a) provides that "[t]he court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances."  Where the limitations in RCW 26.09.191 are not dispositive, the trial court must consider seven factors provided in RCW 26.09.187(3)(a)(i)-(vii).

### A.  FACTOR (i)

The first factor, to "be given the greatest weight," is "[t]he relative strength, nature, and stability of the child's relationship with each parent."  RCW 26.09.187(3)(a)(i).

Timothy argues that the trial court's finding under factor (i) disregarded his bond with Aubrey and that there was no evidence to support a finding that Jennifer had a strong relationship with Aubrey.  We disagree.

Under the first factor, the trial court found that "both [Jennifer and Timothy] love Aubrey very much and . . . she loves you, and both of you are *equally bonded* with her and have stable and loving relationships with Aubrey. . . .  [Y]ou have . . . a different relationship with Aubrey because each of you is a different parent."  RP (Nov. 2, 2015) at 3 (emphasis added).  Thus, the trial court

did not discount Timothy's bond with Aubrey but noted that both parents had equally strong bonds with her.

At trial, the GAL testified that Timothy "really love[d]" Aubrey and that *both* Timothy and Jennifer were very engaged with and had done "really well with Aubrey." 2 RP at 134. Jennifer testified in detail regarding the quality of her time with Aubrey. Thus, there was sufficient evidence for a fair-minded person to conclude that Jennifer, like Timothy, had a strong bond with Aubrey. *See Katare*, 175 Wn.2d at 35. We hold that substantial evidence supports the trial court's finding under factor (i).

## B. FACTOR (ii)

The second factor is "[t]he agreements of the parties, provided they were entered into knowingly and voluntarily." RCW 26.09.187(3)(a)(ii).

Timothy argues that the trial court should have determined that factor (ii) weighed in Timothy's favor because the trial court should have inferred an agreed arrangement from evidence that Timothy was a stay-at-home parent beginning when Aubrey was three months old and that she lived with Timothy immediately after Timothy and Jennifer's separation. We disagree.

Regarding this factor, the trial court found that there was "no agreement regarding the permanent residential placement or residential schedule." RP (Nov. 2, 2015) at 3-4.

First, Timothy's argument fails because Jennifer's testimony suggested that she did not agree to an arrangement in which Timothy cared for Aubrey and did not work. Jennifer stated that she and Timothy "had a rocky relationship" and that she wished to leave Timothy but that she feared Timothy would take Aubrey away from her. 3 RP at 220. Jennifer also indicated that Timothy was at home all the time with Aubrey in Bellingham not by agreement but because

Timothy had been unable to find other employment. Although Timothy testified that the parties jointly agreed for Timothy to stay at home with Aubrey, we may disregard contradictory evidence so long as substantial evidence supports a finding. *Burrill*, 113 Wn. App. at 868.

Second, even if Timothy were correct that the parties had agreed for Timothy to stay at home and care for Aubrey, Timothy does not point to any evidence of an agreement regarding whom Aubrey would primarily reside with when the parties separated. *See* RCW 26.09.187(3)(a)(ii). Rather, Timothy and Jennifer expressly disagreed over Aubrey's residential placement. We hold that substantial evidence supports the trial court's finding under factor (ii).

## C. FACTOR (iii)

The third factor is "[e]ach parent's past and potential for future performance of parenting functions as defined in *RCW 26.09.004(3),[5] including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child." RCW 26.09.187(3)(a)(iii).

Timothy challenges the trial court's finding that Jennifer and Timothy co-parented during their relationship. Timothy further challenges the trial court's finding that this factor favored Jennifer due to Jennifer's schedule; Timothy claims that the trial evidence does not support Jennifer's using her greater free time for Aubrey's betterment. We reject these arguments.

RCW 26.09.004(2) defines "'[p]arenting functions'" as "those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child." Such functions include "[m]aintaining a loving, stable, consistent, and

---

[5] The reviser's note for this provision explains that following the reorganization of RCW 26.09.004, this citation should be to RCW 26.09.004(2).

nurturing relationship with the child," "[a]ttending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family," and "[p]roviding for the financial support of the child." RCW 26.09.004(2)(a), (b), and (f).

The trial court's findings under factor (iii) were as follows:

> With regard to the past, the testimony confirms *a history of co-parenting . . .* during the relationship. . . .
> . . . When [Jennifer] returned to work approximately five to six weeks post-delivery there were occasions where Aubrey went to work with [Jennifer].
> It is undisputed that at various times but primarily when you lived in Bellingham that [Timothy] took care of Aubrey during the day when he was not working. It is also undisputed that at other times when you were living in Port Angeles both parents were working. [Timothy] was in rehab. Aubrey was either at daycare or with [Timothy's] mother or sister.
> The employment decisions also reveal that at one point in time [Timothy] was working a night swing shift when [Jennifer] was working days. *It is not credible nor supported by the evidence[,] the work schedules[,] and the exhibits of earnings that [Timothy] took a greater responsibility in the parenting . . . for any extended period of time.*
> . . . .
> With regard to the future . . . [t]he testimony reveals and is undisputed that [Timothy] relies on and uses many people to help him with Aubrey when she is with him.

RP (Nov. 2, 2015) at 5-7 (emphasis added).

First, Timothy challenges the trial court's findings that Timothy and Jennifer co-parented and that Timothy did not bear a greater portion of the parenting responsibilities. However, Timothy overlooks Jennifer's testimony that even if Timothy was at home more than Jennifer, Timothy did not undertake greater responsibilities in caring for Aubrey. In particular, Jennifer testified that it was she who bathed Aubrey, put her to bed, cleaned the home, and provided meals.

Thus, there is substantial evidence to support the trial court discounting Timothy's actual time spent caring for Aubrey when Timothy was at home with Aubrey.

Timothy's argument also overlooks Jennifer's evidence that she primarily financially supported the family and evidence that although Jennifer worked, she also maintained her relationship with Aubrey, for instance by participating in movie and game nights with Timothy and Aubrey on Jennifer's days off. Attending to Aubrey's daily needs, maintaining a relationship with her, and financially supporting her are all parenting functions under factor (iii). *See* RCW 26.09.187(3)(a)(iii); RCW 26.09.004(2).

Second, Timothy challenges the trial court's finding that Timothy's mother or sister cared for Aubrey. Again, this finding is supported by substantial evidence, namely Jennifer's testimony that Timothy's mother or sister sometimes watched Aubrey when Jennifer worked. Neither was Jennifer's testimony on this point inconsistent: Jennifer testified that she took Aubrey to work with her for only "a couple weeks." 3 RP at 248. It was *after* this couple-week period that Timothy—or day care or Timothy's family—would watch Aubrey.

Third, Timothy argues that the evidence does not support a finding that Timothy's work and time in treatment substantially reduced Timothy's time caring for Aubrey. But the trial court's findings related to Timothy's previous work history and treatment are supported by the record. Jennifer testified that Aubrey went to day care on days that Timothy went to "rehab," and Timothy himself testified that he worked "full time" between November 2012 and February 2013, while the family lived in Port Angeles, and night shifts shortly after Aubrey was born. 4 RP at 381. The trial court did not say that Timothy worked as much as or more than Jennifer; rather, the trial court

simply pointed out that Timothy's work history was another factor to show that Timothy had not taken a greater share of parental responsibilities for any extended period of time.

Fourth, related to future performance of parenting functions, Timothy argues that the trial court erred when it found that this factor favored Jennifer because she no longer worked and disregarded Timothy's testimony about how he utilized his time with Aubrey. However, substantial evidence supports the trial court's findings: in particular, Jennifer's testimony that she did not work at the time of trial and did not "have a plan to go back to work." 3 RP at 235.

Timothy's arguments that the trial court's findings under factor (iii) were not supported by substantial evidence all fail. We hold that substantial evidence supports the trial court's findings that there was a history of co-parenting, that Timothy did not undertake a "greater responsibility" in the parenting "for any extended period of time," and that Jennifer was better situated to undertake future parental responsibilities. RP (Nov. 2, 2015) at 5-6.

## D. FACTOR (iv)

The fourth factor is "[t]he emotional needs and developmental level of the child." RCW 26.09.187(3)(a)(iv).

Timothy argues that the trial court erred when it did not find that factor (iv) favored Timothy because Timothy claims that the evidence showed that Timothy recognized Aubrey's emotional and developmental needs and that Jennifer did not. Again, we disagree.

The trial court found that Aubrey was "at a developmental age where she needs to continue to have both [Timothy and Jennifer] involved in her life" and that the parenting plan needed to provide for Aubrey's needs in an "environment that minimizes her exposure to harmful parental conduct." RP (Nov. 2, 2015) at 8. The trial court focused on Timothy and Jennifer's continued

inability to communicate meaningfully, which negatively affected Aubrey given her age. Thus, the trial court found that this factor weighed in favor of placement with one parent but did not weigh particularly in favor of either Jennifer or Timothy.

Timothy argues that the trial court erred because the evidence should have led the trial court to determine that this factor favored him and disfavored Jennifer. But there is substantial evidence to support the trial court's finding of inability to communicate, which underlies the trial court's determination that this factor did not favor one parent over the other. In particular, Jennifer testified that after Timothy had refused to acknowledge a conversation, Jennifer would only communicate by text, that Timothy had "never" told Jennifer that he moved, that she and Timothy could not agree on a preschool, and that Timothy had refused without explanation to agree to counseling for Aubrey. Timothy's testimony also supported a conclusion that the parents could not meaningfully communicate; in fact, Timothy could not recall the last time the parties had spoken. Thus, we hold that substantial evidence supports the trial court's finding that factor (iv) favored neither parent, although it favored placement with one parent rather than both parents.

## E.  FACTOR (V)

The fifth factor is "[t]he child's relationship with siblings and with other significant adults, as well as the child's involvement with [her] physical surroundings, school, or other significant activities." RCW 26.09.187(3)(a)(v).

Timothy argues that the trial court erred when it did not find that factor (v) favored Timothy because the trial court disregarded Timothy's efforts to build Aubrey's relationships with family members and her friends and connections. Timothy's argument lacks merit.

15

Related to factor (v), the trial court found that Aubrey had relationships with Maxwell's children as well as Timothy's siblings, who are Aubrey's aunt and uncle, and Timothy's parents, who are Aubrey's grandparents. The trial court also found that Aubrey had "good relationships" with other people in the environments that she spent time in while she resided with Timothy. RP (Nov. 2, 2015) at 10. Thus, the trial court found that this factor favored both parents.

Jennifer testified that she lived with Maxwell and his children, including Aubrey's half-sibling, and that Aubrey enjoyed playing with the other children and taking care of her half-sibling. Timothy testified that he lived with Aubrey's aunt and uncle and that Aubrey "pretty well engaged with everybody" in Timothy's environment. 4 RP at 401. Timothy's sister similarly testified that she and Aubrey were "'[b]est friends.'" 5 RP at 510. Timothy also explained that he brought Aubrey to visit his parents in Port Angeles on the weekends and that she had at least one playmate in that area. Further, Timothy's parenting coach opined that Port Angeles, where Timothy's parents lived, was a "place of community" for Aubrey. 4 RP at 451. We hold that this is substantial evidence to support the trial court's finding under factor (v).[6]

## F. FACTOR (vii)

Factor (vii) is "[e]ach parent's employment schedule"; the trial court "shall make accommodations consistent with those schedules." RCW 26.09.187(3)(a)(vii).

---

[6] The omitted factor is (vi), "[t]he wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to [her] residential schedule." RCW 26.09.187(3)(a)(vi). The trial court found that the parents' wishes were contradictory under factor (vi). Timothy does not challenge the trial court's findings under factor (vi), so that the trial court's finding under this factor is a verity on appeal. *Fiorito*, 112 Wn. App. at 665.

Timothy briefly argues that the trial court erred when it found that Timothy worked "consistently" throughout the relationship under factor (vii). This argument fails.

The trial court found that this factor weighed in favor of Jennifer, whose schedule had "the most flexibility" at the time of trial. RP (Nov. 2, 2015) at 13. In doing so, the trial court noted that Timothy had a "consistent history of employment" during and after the relationship at "various jobs," although Timothy did not earn as much as Jennifer. RP (Nov. 2, 2015) at 13.

Timothy testified at trial that he worked during the relationship for the first few months of Aubrey's life, for a few months in late 2011, and full time between 2012 and 2013. After the separation, Timothy testified that he held various jobs from May to December 2014 and that he worked full time beginning in April 2015. Thus, there is substantial evidence to support Timothy having a "consistent history of employment" at "various jobs" during and after the relationship, and we affirm the trial court's findings under factor (vii). RP (Nov. 2, 2015) at 13.

## G. WEIGHING THE RCW 26.09.187(3)(a) FACTORS

Timothy assigns error to the trial court's weighing of the RCW 26.09.187(3)(a) factors. Timothy also argues that the trial court discounted Aubrey's relationships with Timothy's family and community under factor (v) when the trial court determined that Aubrey would spend the majority of residential time with Jennifer. We disagree.

When the trial court weighed the RCW 26.09.187(3)(a) factors, it determined that the most important factor, factor (i), favored both parents equally and that the remaining factors either favored Jennifer or did not favor either parent. RCW 26.09.187(3)(a). The trial court concluded that in light of the factors, the appropriate parenting plan would be to maintain equal residential schedules until Aubrey started kindergarten and for her to then reside primarily with Jennifer, but

spend most of her weekends with Timothy. In reaching its decision, the trial court gave particular weight to Jennifer's more flexible schedule and the parties' inability to meaningfully communicate, which made midweek transfers infeasible.

As discussed, substantial evidence supports the trial court's challenged findings. Further, the trial court properly weighed the RCW 26.09.187(3)(a) factors and endeavored to "encourage each parent to maintain a loving, stable, and nurturing relationship with" Aubrey, as RCW 26.09.187(3)(a) directs. In doing so, the trial court did not discount Aubrey's relationships with Timothy's family and community; the trial court recognized these relationships and noted that the parenting plan would serve to increase Aubrey's actual time with Timothy. We hold that the trial court did not abuse its discretion when it implemented the final parenting plan and designated Jennifer as the "primary residential parent." RP (Nov. 2, 2015) at 15.

### III. EDUCATION AND HEALTH CARE DECISION-MAKING AUTHORITY PROVISION

Timothy argues that the trial court erred when it granted education and health care decision-making authority to Jennifer based upon the trial court's finding of lack of communication. Timothy argues that the evidence shows that Jennifer, not Timothy, was responsible for the inability to communicate.[7] We disagree.

A permanent parenting plan must allocate decision-making authority regarding education, health care, and religious upbringing. RCW 26.09.184(5)(a). In doing so, the trial court shall

---

[7] Timothy asks this court to consider his counsel's motion for reconsideration arguments on this issue in addition to Timothy's pro se argument on appeal. We decline to do so because appellate arguments that incorporate trial court briefing by reference are improper and must be disregarded. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). Similarly, we also disregard Timothy's argument incorporating his trial briefing that the trial court wrongly considered the "pornography issues."

order "sole decision-making" if it finds that RCW 26.09.191 mandates a limitation on one parent's decision-making,[8] that "[b]oth parents are opposed to mutual decision making," or that "[o]ne parent is opposed to mutual decision making, and such opposition is reasonable based on" mutual decision-making criteria. RCW 26.09.187(2)(b)(ii), (iii).

At trial, each parent requested sole decision-making authority for Aubrey. Because of the parties' contrary positions, RCW 26.09.187(2)(b)(ii) required that the trial court order sole decision-making.

Timothy argues that the trial court should have allocated decision-making authority to him, not to Jennifer. This argument fails insofar as Timothy restates his challenge to the trial court's finding that both parents were to blame for the inability to meaningfully communicate. Further, because the trial court found that Timothy and Jennifer were unable to meaningfully communicate and determined that Aubrey should reside primarily with Jennifer, the trial court had tenable grounds and reasons to also decide that Jennifer should have sole education and health care decision-making authority, as the parent who primarily resided with Aubrey. *See Katare*, 175 Wn.2d at 35. We hold that the trial court did not abuse its discretion when it allocated education and health care decision-making authority to Jennifer.

---

[8] Under RCW 26.09.191(3)(e), (g), the trial court may preclude or limit parenting plan provisions if there has been "abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development" or "[s]uch other factors or conduct as the court expressly finds adverse to the best interests of the child." Jennifer argues that we should affirm the trial court's allocation of decision-making under this provision; however, Jennifer's argument overlooks that the trial court found that RCW 26.09.191 did not apply.

IV. FAILURE TO LIMIT JENNIFER'S RESIDENTIAL TIME FOR CREATING CONFLICT

Timothy argues that the trial court should have limited Jennifer's residential time "under RCW 26.09.191(2)(a)(iii)." Br. of Appellant at 26. In doing so, Timothy challenges the trial court's failure to allocate blame for abusive use of conflict to Jennifer in light of her past and the trial court's equal apportionment of blame between the parties in light of the September 2015 driver's license incident. We reject Timothy's arguments.

A trial court has discretion to determine whether the admitted evidence meets the requirements of RCW 26.09.191. *In re Parentage & Support of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016). RCW 26.09.191(2)(a)(iii) requires a trial court to limit a parent's residential time if the trial court finds that the parent engaged in "a history of acts of domestic violence as defined in *RCW 26.50.010(1)[9] or an assault or sexual assault which causes grievous bodily harm or the fear of such harm." RCW 26.09.191(3) also allows a trial court to "preclude or limit any provisions of the parenting plan" if the trial court finds "[t]he abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." RCW 26.09.191(3)(e).

The trial court did not find that either party engaged in the abusive use of conflict; rather, the trial court found that Jennifer and Timothy did not have mutual cooperation, communication, or respect and that their current conduct, including their inability to meaningfully communicate,

---

[9] The reviser's note for this provision explains that following the reorganization of RCW 26.50.010, this citation should be to RCW 26.50.010(3). RCW 26.50.010(3) defines "'[d]omestic violence'" as "(a) [p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members; (b) sexual assault of one family or household member by another; or (c) stalking as defined in RCW 9A.46.110 of one family or household member by another family or household member."

resulted in a "huge" risk of "actual or potential harm" to Aubrey if it continued. RP (Nov. 2, 2015) at 14. The trial court expressly declined to impose limitations under RCW 26.09.191.

Timothy argues that the trial court's refusal to impose limitations was an abuse of discretion because the trial court overlooked Jennifer's prior domestic violence charge. We disagree: the sole domestic violence incident referenced at trial was Jennifer's admission that she had been charged with assaulting a prior boyfriend. Jennifer testified that the charges against her had been dismissed and that she had not actually assaulted her boyfriend. Thus, the trial court was within its discretion to conclude that this testimony did not amount to a history of domestic violence or an assault under RCW 26.09.191(2)(a)(iii).

Timothy also appears to argue that the trial court erred when it did not find that Jennifer had engaged in the abusive use of conflict under RCW 26.09.191(3)(e). But at trial, the evidence showed that *both* parents caused conflict: for instance, Jennifer testified that Timothy had threatened to take Aubrey away from her and also admitted that she had withheld Aubrey. Jennifer also testified that Timothy had refused to enroll Aubrey in counseling without explanation. And the GAL testified that Timothy created conflict on more than one occasion but acknowledged that Jennifer was also partially to blame. Accordingly, there was substantial evidence to support a conclusion that both parents contributed to causing conflict.

Substantial evidence supports the trial court's findings allocating blame to both parties for detrimental conduct. Notably, the trial court's parenting plan addressed this issue by limiting unnecessary contact between the parents. In light of this limitation and the lack of evidence of domestic violence under RCW 26.09.191(2)(a)(iii), we hold that the trial court acted within its

discretion when it declined to impose limitations on Jennifer's residential time under RCW 26.09.191.

## V. FAILURE TO LIMIT JENNIFER'S RESIDENTIAL TIME DUE TO PORNOGRAPHY ISSUE

Without citation to legal authority,[10] Timothy argues that the trial court erred when it found that Maxwell's pornographic postings had not impacted or been accessible to Aubrey. We disagree.

Related to Maxwell's pornographic postings, the trial court found that "[t]here is no evidence to suggest that Aubrey had access or that she had any impact as a result of those postings by Mr. Maxwell." RP (Nov. 2, 2015) at 18. The trial court rested this finding on the GAL's testimony that her unannounced visit to Maxwell and Jennifer's home revealed nothing of concern and Maxwell's testimony that the pornographic materials were removed; the trial court also found, without evidentiary support, that "child blocks have been established." RP (Nov. 2, 2015) at 19.

Timothy is correct that the portion of the trial court's finding pertaining to child blocks lacks evidentiary support; however, the record supports the remainder of the trial court's findings. Accordingly, we hold that substantial evidence supports the trial court's finding that the pornography posted on Maxwell's social media did not impact Aubrey and that the trial court properly declined to limit the parenting plan on this basis.

---

[10] The applicable legal authority for limitation of residential time is RCW 26.09.191(3)(g). That statute notes that a "parent's involvement or conduct may have an adverse effect on the child's best interests" and vests the trial court with authority to "preclude or limit any provisions of the parenting plan, if any of the following factors exist: [including] [s]uch other factors or conduct as the court expressly finds adverse to the best interests of the child." RCW 26.09.191(3)(g).

No. 48414-5-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

LEE, J.