IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 79096-0-I |
| | ) | |
| ERIC MARVIN WIRKKALA, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| LORI DENISE WIRKKALA, | ) | FILED: August 5, 2019 |
| | ) | |
| Appellant. | ) | |
| | ) | |

MANN, A.C.J. — On March 17, 2017, the trial court issued a final decree of dissolution in the marriage of Eric and Lori Wirkkala.[1] The court awarded the couple's business—Wirkkala Construction, Inc. (WCI)— to Eric but required him to pay Lori 60 percent of the value of the business' assets. The court also determined that 17 percent of Lori's Oregon PERS 1 retirement account was community property. Lori appeals.

Because the final distribution of property below was fair, just, and equitable, we affirm.

---

[1] We use the parties' first names to avoid confusion. No disrespect is intended.

I.

Eric and Lori began a romantic relationship between 1993 and 1994. In 1994 or 1995, the couple bought paving equipment and started a part-time asphalt sealing company together. In 1995, the couple incorporated WCI. The next year, after Eric and Lori purchased Swensen Construction, WCI became Eric's full time job. Lori remained employed full-time for Clatsop County, Oregon, and worked for WCI on nights and weekends. In general, Eric was in charge of the day-to-day operations while Lori took care of the books and office work.

Eric and Lori were married in 1998. In 1999, Lori left her job with Clatsop County and became a full-time employee of WCI. Throughout this period, the couple's personal and business finances were intertwined. While each took a salary from WCI, they also used WCI accounts to pay for personal expenses.

In August 2010, Eric petitioned for legal separation. Lori counter-petitioned for dissolution. The trial court initially entered a temporary order intended to preserve the status quo. The court granted the parties 50/50 residential time with their son and ordered that they cooperate to operate WCI jointly. The court also appointed Niki Goodin "to help the parties straighten out the business [books] and to report to the court about the status and issues of the business."

In March 2014, Eric asked the trial court to remove Lori from the business and to alter the parenting plan. Relevant here, Eric argued that Lori was violating the court's temporary order by not cooperating with Goodin and refusing to turn over business records.

The trial court found "there is substantial evidence that [Lori] has violated the court's order." The court restrained Lori from "acting in any manner for [WCI] and ordered [her] to turn over all business records related in any way with [WCI]."

On October 23, 2014, the trial court judge recused himself and the case was reassigned to a new trial court judge. Trial was held trial over two periods of time. The first phase of trial took place in June 2015 and was primarily focused on the parenting plan. During this period, the parties agreed to have two independent entities—Keith Thurman and the Ritchie Brothers Auction House—appraise all of the parties' real property and WCI's assets. But the parties never agreed on an entity to appraise WCI, itself.

The second phase of trial took place in February 2016 and primarily addressed the parties' property, including Lori's Oregon PERS 1 retirement account. The parties' agreed that some portion of Lori's account was community property but disagreed what portion. Lori testified that she had accumulated 17 years' worth of PERS 1 funds before she married Eric and only 13 months after her marriage. Eric argued that 17 percent of Lori's PERS 1 account was community property.

On April 11, 2016, the trial court issued a letter ruling detailing how it intended to divide the parties' property. The court issued a final decree of dissolution and accompanying findings of fact and conclusions of law on March 17, 2017. The court awarded WCI to Eric but mandated that he pay Lori 60 percent of the value of the business' assets as compensation. The court also concluded that 17 percent of Lori's PERS 1 account was community property. Lori appeals.

II.

In a dissolution action, "the trial court must order a 'just and equitable' distribution of the parties' property." In re Marriage of Larson and Calhoun, 178 Wn. App. 133, 137, 313 P.3d 1228 (2013) (citing RCW 26.09.080). "A just and equitable division does not require mathematical precision, but rather fairness." Larson, 178 Wn. App. at 138 (internal citation removed). The trial court is in the best place to decide issues of fairness. Brewer v. Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). Moreover, the erroneous valuation of one item does not require reversal of an otherwise fair and equitable distribution. In re Marriage of Pilant, 42 Wn. App. 173, 181, 709 P.2d 1241 (1985).[2] As the Supreme Court has counseled,

> [T]rial court decisions in a dissolution action will seldom be changed upon appeal. Such decisions are difficult at best. Appellate courts should not encourage appeals by tinkering with them. The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court. The trial court's decision will be affirmed unless no reasonable judge would have reached the same conclusion.

In re Marriage of Landry, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985).

A.

Lori first contends that there is insufficient evidence in the record from which the trial court could have concluded that 17 percent of her PERS 1 retirement account was community property.

---

[2] See also In re Marriage of Brady, 50 Wn. App. 728, 732, 750 P.2d 654 (1988) ("Despite the trial court's error in characterization of the parties' property, we will not disturb the distribution of those properties if in our judgment that distribution is otherwise fair, just and equitable.").

Findings of fact may be overturned only if they are not supported by substantial evidence in the record. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." Katare, 175 Wn.2d at 35. We will reverse a trial court's division of property only if the trial court manifestly abused its discretion. In re Marriage of Wright, 179 Wn. App. 257, 261, 319 P.3d 45 (2013).

The evidence in the record establishes that Lori accumulated 18 years' worth of funds in her PERS 1 account. She asserts that based on the date the couple were married 13 months' worth of the account was community property, or about 6 percent.[3] The record, however, establishes that Eric and Lori were in an intimate committed relationship before they were married. They began dating in 1993 or 1994, they made a major purchase and began a business together in 1994, and they incorporated WCI together in 1995. If the community property accumulation began at the date the pair incorporated WCI, about 22 percent of Lori's PERS 1 account would be community property.[4] If it began from when they purchased the paving equipment, about 28 percent would be community property.[5]

Below, Eric presented argument to the trial court on Lori's PERS 1 account numerous times. Each time his general theme was the same: "I proposed a number for the PERS . . . which was purely a speculation . . . the number I had proposed for the community number is not mathematically precise." It was not mathematically precise because Lori refused to turn over current documents on the account. As Eric's counsel

---

[3] (13 months / 216 months) x 100 = 6.01 percent. 18 years equals 216 months.
[4] (4 years / 18 years) x 100 = 22.2 percent.
[5] (5 years / 18 years) x 100 = 27.7 percent.

explained, "I've received nothing. This is a very simple thing for [Lori] to get from the State of Oregon . . . I've got nothing but eight-year old records."

The trial court similarly expressed its dissatisfaction with Lori's failure to turn over necessary documents, "you're the one that has control or the ability to get information from that account." The court then warned, "I'm going to complete the paperwork and reserve on that issue and give her 90 days to come up with the actual . . . information or else I will accept [Eric's] number." And the court wrote in the Decree of Dissolution, Lori "must present all current PERS 1 value information or the amount listed shall remain unchanged." Yet the record still contains no information about Lori's PERS 1 account information.

Lori was given numerous chances to submit actual up to date information about her PERS 1 account and was specifically told if she failed to do so the court would accept Eric's numbers. While it is not clear from the record precisely where Eric got the 17 percent figure from, 17 percent is certainly within the realm of possibility when one considers that it could have been as high as 28 percent. Because the precise start date of their intimate committed relationship is unclear and because Lori failed to correct Eric's proposed numbers, the trial court's determination that 17 percent of Lori's PERS 1 account was community property was not an abuse of discretion.

B.

Next, Lori argues that the first assigned trial judge abused its discretion when modifying the original temporary order and removing Lori from WCI. But a final judgment renders the propriety of a temporary order moot. Ferry County Title & Escrow Co. v. Fogle's Garage, Inc., 4 Wn. App. 874, 881, 484 P.2d 458 (1971); see also

Valentine v. Valentine, 31 Wn.2d 650, 653, 198 P.2d 494 (1948) (questions on the propriety of a temporary restraining order were moot in light of the final decree); State ex rel. Carroll v. Simmons, 61 Wn.2d 146, 149, 377 P.2d 421 (1962) (a temporary order merges with the final judgment and any questions as to the propriety of the temporary order becomes moot). Therefore, Lori's argument is moot.

C.

Finally, Lori argues that the trial court erred in valuing WCI. The "trial court has broad discretion with respect to property division . . . and will be reversed only upon a showing of a manifest abuse of discretion." In re Marriage of Olivares, 69 Wn. App. 324, 328, 848 P.2d 1281 (1993), abrogated on other grounds by, In re Estate of Borghi, 167 Wn.2d 480, 219 P.3d 932 (2009). A court abuses its discretion when its decision is "manifestly unreasonable, or based on untenable grounds or reasons." Wright, 179 Wn. App. at 261. "[T]he trial court must ensure that the final division of the property is fair, just and equitable under all the circumstances." Olivares, 69 Wn. App. at 329.

Lori asserts that the trial court failed to precisely set forth which factors and methods it considered in finding the value of WCI. Lori contends that In re Marriage of Berg, 47 Wn. App. 754, 756-57, 737 P.2d 680 (1987), held that a trial court's reliance on a company's book value is per se insufficient to value the company.[6]

Berg does not hold that reliance on book value is per se insufficient.[7] And further, the trial court properly set forth the factors it considered and did not rely on just WCI's book value. In Berg, similar to here, the primary dispute was the value of the

---

[6] "Book value means the value of the corporation as shown on the books of account after subtracting liabilities." Berg, 47 Wn. App. at 755, n.1.

[7] Instead, it simply recognizes that "numerous courts have rejected the contention that book value alone is an accurate measure of a corporation's actual value." Berg, 47 Wn. App. at 758.

parties' business. 47 Wn. App. at 755. On appeal, the court concluded that the trial court failed to create an adequate record for review of the business' value. Berg, 47 Wn. App. at 756. The court noted that "when a trial court values a closely held corporation for purposes of a dissolution, it must set forth on the record which factors and method were used in reaching its final value." Berg, 47 Wn. App. at 757. The trial court in Berg failed to do so, because it "simply accepted respondent's testimony that the corporation was worth its book value even though the court expressly stated in its memorandum opinion that the business had a market value." Berg, 47 Wn. App. at 758.

Here, the trial court did much more. First, the trial court repeatedly admonished both parties that an expert appraiser was necessary to fully value WCI and if they could not agree on one, the court could evaluate options under a battle of the expert type scenario.[8] Lori cannot refuse to take up the court's offer to pick an appropriate expert, refuse to hire her own expert, and now argue that the court erred in not fully valuing WCI when it was impossible for the court to do so without an expert appraiser. And this is especially true where, as here, Lori openly admitted that she wanted the court to sell off WCI's assets and simply divide the proceeds—which indicates that it would be against her interest to get WCI fully appraised.

But more importantly, the trial court set out what factors it was considering and did not consider just WCI's book value. All of WCI's major assets were appraised by

---

[8] See Report of Proceedings (RP) (Sept. 21, 2015) at 79-80 ("I mean . . . my only option [might be to liquidate the business and split the proceeds] . . . If you can't agree on an evaluator, maybe you can agree to let the Court pick an evaluator and then we can start the trial on the other property . . . . If you have a battle of the two evaluators, I can hear their credentials and how willing they are to be independent and what their prices are going to be and you can agree that the Court will appoint one . . . . I don't see me picking a number out of the sky [as to the business's value] just because we have no evaluator and the parties come in and one says there's really no value of the business and the other says, oh, the business is worth a million dollars.")

experts. This allowed the court to establish a baseline value for WCI, similar to its book value. The trial court then recognized that there was some additional value associated with WCI's goodwill beyond the value of its assets. The court determined that it was appropriate to account for this additional value by granting Lori 60 percent of the value of the business's assets.[9]

The trial court did exactly what was required of it. It took the presentation of evidence that it received and divided the property in a fair and equitable manner. It accounted for the fact that there was value in WCI above and beyond the book value by granting Lori a 60/40 split on the value of WCI's assets. And it otherwise divided the parties' property in a reasonable manner. Based on the evidence in the records before us, this was not a manifest abuse of the trial court's discretion.

Affirmed.

_Mann, A.C.J._

WE CONCUR:

_Chun, J._                                    _Appelwick, C.J._

---

[9] See RP (Jan. 19, 2017) at 106-07, 112 ("I said the business is going to be divided 60/40, because he gets an ongoing business with goodwill and all the things that we didn't have expert testimony about . . . I recognize there's goodwill in [WCI] . . . That's where I – I tacked on the 60/40."); RP (Mar. 10, 2017) at 14-15 ("I gave her 60 percent because I didn't get anything else from . . . him. Just to do a fire sale of everything would have resulted in both sides getting less. So I did the best I could with admittedly poor presentation of evidence.").