
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Parenting and Support of | ) | No. 40297-5-III |
| | ) | |
| Z.F.R.† | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

LAWRENCE-BERREY, C.J. — Neila Reutov appeals the trial court's parenting plan

for her young son, Z.F.R. She argues the record required the trial court to find the

presence of a limiting factor, i.e., a history of domestic violence, and to find that a shared

residential schedule was not in Z.F.R.'s best interest. We disagree and affirm.

FACTS

*Overview*

Neila Reutov and Matthew Lee are a separated couple who have one child

together, Z.F.R. In late 2022, Lee filed a petition for a parenting plan, residential

schedule and/or child support. One week later, the trial court issued a temporary

parenting plan. In the spring of 2023, the court issued a second temporary parenting plan.

---

† To protect the privacy interests of the minor child, we use their initials
throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title*
(Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

The second plan provided a three-phase plan in which Lee would gradually receive increased residential time with Z.F.R. The plan did not place any restrictions on either parent. Both parties filed cross motions for revision, which the court denied.

*Trial*

The matter proceeded to a two-day trial. Because the issues on appeal are limited, we highlight only those portions of the witness testimonies bearing on Lee's purported domestic violence and the residential schedule.

A.     *Matthew Lee*

Lee testified he had been absent for approximately the first eight months of his child's life. Lee was initially employed for an out-of-state job that provided a two weeks on/one week off work schedule, which allowed him to return home during his time off. Lee wanted to see his son more, so he found an in-state job with less pay. Lee stated his parenting plan proposal was close to a 50/50 split, with Reutov receiving slightly more time with Z.F.R. Lee assured Reutov that when his work was in its busy season, his wife, Cassandra Lee, would be able to care for Z.F.R. when necessary.

Lee claimed he tried to attend the birth of his child, but Reutov did not want him present. He saw Z.F.R. for the first time when he was six days old and was only allowed 10 minutes at a park. Lee said he has repeatedly tried to co-parent with Reutov, but their disagreements have made it difficult. Lee claimed he had attempted to get Z.F.R.

vaccinated, but Reutov refused to discuss the issue. Lee stated that he needs to repeatedly ask the same questions in order to get an answer about Z.F.R.'s health. There was also disagreement over whether the child should get evaluated by a dentist.

Lee testified that he made $123,447 in 2022 and left that job in order to spend more time with his son. At the time of trial, Lee held a class A commercial driver's license. His employment was dependent on whether his union had available work. Lee expressed to the court that the best thing for his child is to have both parents involved, and he believes that Z.F.R. would be disadvantaged by not having a father figure in his life.

### B. Neila Reutov

Reutov testified she is self-employed, working as a dog trainer at her residential address. Her work is by appointment, and she strives to work 40 hours per week. Reutov also boards dogs between two to seven nights per week. She boards the dogs in a separate area from where Z.F.R. is during the day. When Reutov is unable to care for her son, his paternal grandmother, Jennifer Strand, cares for him. Reutov testified that Strand cares for Z.F.R. for roughly four hours per week.

Reutov testified she plans to build a kennel on a different part of her property and reserve a play-area space for Z.F.R. in order to continue caring for him while working. She expects to ask for help watching Z.F.R. when needed. Reutov testified that she only

leaves Z.F.R. alone for very brief periods, such as when she needs to feed the dogs. Reutov claims her business has not interfered with her ability to care for Z.F.R.

Reutov and Lee lived together between Fall 2020 and November 2021. Z.F.R. was born in May 2022. Reutov testified that Lee verbally abused her during the relationship, specifically by name-calling. Reutov claimed that Lee had a substance abuse problem, pointing to a time when Lee was taking a coworker's Adderall prescription. Reutov claimed that these two reasons were factors in her decision to end the relationship.

Lee attended Reutov's doctor's appointments during her pregnancy. By the time Reutov gave birth to Z.F.R., Reutov and Lee were not speaking with each other. Reutov claims she was stressed and moved to a new residence to avoid him. However, Lee learned where she was living and visited the residence despite Reutov telling him to stop. Reutov told Lee that she did not want him present for the child's birth because he was causing her stress. After Reutov returned home from the hospital, she attempted to arrange a visit between Lee and Z.F.R. at Lee's mother's house. Lee did not want the visit to take place at his mother's house and instead preferred they meet at a restaurant, which Reutov declined.

Between the time when Lee filed a paternity action and November 2022, Reutov claimed that Lee did not show interest in having contact with Z.F.R. Had Lee shown

interest, Reutov stated that she would have arranged a visit. Since late 2022, Lee has exercised his allotted time with Z.F.R. Reutov testified that she has the most significant and stable relationship with Z.F.R. She also testified that Z.F.R. has a strong relationship with her sister, Christina Reutov, who helps care for Z.F.R. Reutov also testified that Z.F.R. has a strong relationship with his grandparents.

Reutov asked to continue being the primary parent of Z.F.R. While Z.F.R. has never returned from Lee's care with a physical injury, Reutov is concerned about Lee's parenting abilities. Reutov has noticed that Z.F.R. returns from Lee's visits with severe diaper rashes. Additionally, Reutov is concerned about Z.F.R.'s diet when in Lee's care. Reutov noted that it takes up to one week for Z.F.R. to adjust his behavior after returning to her care. Reutov testified it would be best if Z.F.R. visits Lee every other weekend.

Reutov testified that she has been investigated by Child Protective Services (CPS) following a report made by Lee. Reutov's business has also been the subject of an investigation following another report made by Lee. CPS closed the investigation into Reutov, finding no concerns, and her business was cleared of any wrongdoing. Reutov describes her communications with Lee as challenging. Reutov claims Lee is combative and is never satisfied with her answers to his questions. Reutov testified she has concerns about making joint decisions with Lee.

Reutov noted that Lee usually provided visitation dates with Z.F.R. based on his work schedule. Reutov claims that Lee did not give her advance notice of his change in employment. Reutov refused to adjust the schedule because she had already made plans around it.

Reutov does not want Z.F.R. to receive vaccinations due to her religious beliefs, while Lee wants Z.F.R. to receive some, but not all. Reutov's religion forbids preventative health measures such as vaccines but allows for treatment when an individual becomes sick. In accordance with their religious beliefs, neither Reutov, her sister, nor her parents have been vaccinated.

Lee questioned Reutov on cross-examination. Reutov said that Z.F.R. was behind on his speech abilities and is experiencing some dental issues.[1] Lee asked Reutov why she had offered him extra time with Z.F.R. on one occasion, and Reutov responded that she was trying to be nice and that Lee did not like her previous answers. Lee also questioned Reutov about an occasion where she allowed Lee to take Z.F.R. for extra time so that Reutov could keep her vet appointment. Lee asked Reutov why she did not contact Lee while Z.F.R. stayed with him overnight if she was concerned about his

---

[1] Reutov stated that Z.F.R.'s dental issues were not a result of neglect and that Z.F.R.'s teeth are simply not growing in as expected. Reutov testified that she informed Lee of these dental issues and that Lee has never attended any appointments despite being aware of them.

6

safety. Reutov stated that she did not reach out because it was Lee's designated parenting time.

Lee then asked Reutov about an incident involving her sister, Anfisa. Reutov testified that Anfisa assaulted both her and her friend. She admitted that her sister was hitting her friend when Lee intervened and choked her sister to protect her friend.

Lee asked Reutov why she did not call the police if there was domestic violence, and Reutov said she did not know. Lee asked if there had been any domestic violence in their relationship. Reutov testified that Lee did have a history of domestic violence, noting that he slammed doors and acted violently toward his dog on one occasion.

Reutov testified she does not have any conflicts with Lee when they exchange Z.F.R. She said that one of the possible reasons that Z.F.R. comes home with a diaper rash is that Lee gives him too much fruit juice. Reutov testified that Z.F.R. has never been injured in Lee's care.

Reutov testified to the behavior changes that Z.F.R. exhibits after returning from Lee's care. Reutov said that Z.F.R. becomes very clingy and does not want Reutov to leave his sight. She noted that his nap schedule is more difficult to maintain following an exchange. Reutov testified that she has informed Lee of these difficult transitions in the past but has stopped communicating these issues because she does not want to badger

him. Reutov admitted that having a father in a child's life can be important to their development and health.

On redirect examination, Reutov was asked why she stayed with Lee despite his acts of domestic violence. She stated that she still loved him at the time and had nowhere else to go. Reutov stated that Lee's history of domestic violence makes it difficult for the two of them to communicate. Reutov noted that it is difficult to communicate effectively with Lee regarding any issues with Z.F.R.

Reutov stated that she believes it is in Z.F.R.'s best interest to have a healthy relationship with his father. She claims she is not trying to restrict Z.F.R.'s time with Lee and wants Z.F.R. to spend the same amount of time with Lee as prescribed in the temporary parenting plan that was in place at the time of trial.

### C. Zach Hansen

Zach Hansen is the ex-husband of Lee's current wife, Cassandra Lee. Hansen and Cassandra had one child together. Hansen testified that he has seen Lee interact with Hansen's son, and he believes Lee is a loving father. Hansen has never seen Lee angry, mean, or violent toward children. Hansen also testified that Lee has a strong relationship with Cassandra's other child. On cross-examination, Hansen stated that he had seen Lee with Z.F.R. approximately 10 times since Z.F.R. was born.

### D.      Cassandra Lee

Cassandra is Matthew Lee's wife.  Cassandra testified that Lee is a loving, attentive, and caring father toward Z.F.R.  Cassandra's children have a strong relationship with Lee, and she feels that he has been a positive influence in their lives.  Cassandra and her children have a good relationship with Z.F.R.

### E.      Carol Berquist

Carol Berquist is Lee's mother-in-law, and they have known each other for approximately one year.  Berquist testified that Z.F.R. appears to be very happy while under the care of Lee.  Berquist also stated that Lee has a phenomenal relationship with Berquist's grandchildren and has had a positive impact on their lives.  Berquist said that she never saw Lee yell, act meanly, or behave violently toward the children or his wife.

### F.      Christina Reutov

Christina Reutov is Neila Reutov's sister.  Christina has lived with Reutov and Z.F.R. since Z.F.R. was born.  Christina testified that Z.F.R. has a very strong relationship with Reutov and that she does not have any concerns about Reutov as a parent.  On cross-examination, Christina said that she is not familiar with Lee's parenting ability because she has not seen him with Z.F.R. outside of pickups and drop-offs.

G. *Jennifer Strand*

Jennifer Strand is Lee's mother. Strand first met Reutov when she was dating Lee. Strand sees Z.F.R. approximately four times per month for between one and four hours per visit. Reutov is present during Strand's visits. Strand testified that Z.F.R. has a good relationship with Reutov and that she is a good mother. Strand does not have any concerns about Reutov's parenting ability and has never seen her engage in neglectful or abusive behavior toward Z.F.R. On cross-examination, Strand testified that she had never seen Lee interact with Z.F.R. and knows nothing of his parenting skills.

*Joint decision making and shared residential schedule ordered*

Following trial, the court entered a final parenting plan. The parenting plan provides for joint decision-making for major determinations. It also provides different time schedules before and after Z.F.R. starts kindergarten. Before Z.F.R. starts kindergarten, he is scheduled to live primarily with Reutov. Lee has residential time with Z.F.R. every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m. and every Wednesday from 5:00 p.m. until 7:30 p.m. When Z.F.R. begins kindergarten, he will begin living with both parents for an equal amount of time on a week-on, week-off basis, with exchanges taking place every Monday at 6:00 p.m. The court did not place limitations on either parent for decision making or time schedules.

Reutov appeals the final parenting plan to this court.

ANALYSIS

Reutov argues the trial court erred in not finding the presence of a limiting factor, i.e., a history of domestic violence, and in finding that a shared residential schedule was in the best interest of Z.F.R. For the reasons below, we disagree.

*Standard of Review*

"[A] trial court's rulings dealing with the provisions of a parenting plan are reviewed for abuse of discretion." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Id.* at 46-47. A decision is manifestly unreasonable if it does not fall within the range of acceptable choices given the facts and applicable legal standard. *Id.* at 47.

A trial court's findings of fact are reviewed for substantial evidence, which requires "a sufficient quantum of evidence in the record to persuade a reasonable person that a finding of fact is true." *Pardee v. Jolly*, 163 Wn.2d 558, 566, 182 P.3d 967 (2008). An appellate court should not substitute its own judgment on a trial court's factual finding if supported by substantial evidence. *Id.*

A.   INSUFFICIENT EVIDENCE OF DOMESTIC VIOLENCE

If the court finds that a parent has a history of acts of domestic violence as outlined in RCW 7.105.010, the permanent parenting plan shall not require mutual

decision-making. Former RCW 26.09.191(1)(c) (2021). Furthermore, a parent's history of domestic violence requires courts to limit that parent's residential time with the child. RCW 26.09.191(2)(a)(iii). "Domestic violence" is defined as "[p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; coercive control; unlawful harassment; or stalking of" an intimate partner, family member, or household member by the same. Former RCW 7.105.010(9)(a), (b) (2022). Here, the trial court found that neither party lived in a home with a person who had a history of domestic violence.

Reutov first argues that Lee engaged in domestic violence by abusing his dog while the parties were living together. Regardless of the accuracy of this claim, violence directed toward household pets does not fall under the definition of "domestic violence" under former RCW 7.105.010(9). To qualify for this definition, the victim must be an intimate partner, family member, or household member. Former RCW 7.105.010(9)(a), (b). Each category requires that a victim be a person. *See* former RCW 7.105.010(13), (20).

Reutov next argues that Lee's history of verbal abuse supports a finding of domestic violence. At trial, Reutov stated the following in response to a question regarding the type of verbal abuse that she faced:

> MS. REUTOV: He would call me crazy, especially when I found out I was pregnant. He was not happy about it at first. He said he would never want a parenting plan with me because I'm a crazy bitch. Just a lot of name-calling.

Rep. of Proc. at 137. The categories of domestic violence that do not include physical violence are infliction of fear of physical harm, coercive control, and unlawful harassment. *See* former RCW 7.105.010(9). The name-calling described above did not threaten violence nor did it necessarily establish a history of coercive control or harassment.

Reutov lastly argues that Lee's use of physical force against her sister qualifies as domestic violence. Here, Lee and Anifisa are family members because they are related by marriage. *See* former RCW 7.105.010(13). Thus, if Lee assaulted Anifisa, this would qualify as domestic violence. But here, Lee's use of force was arguably lawful because he choked Anifisa to prevent her from assaulting Reutov's friend. Exercising lawful force is not that type of force that qualifies as "domestic violence." This is especially true, here, where Anifisa had also hit Reutov, and Lee's intervention in the fight also could be viewed as *protecting* her.

We conclude that the trial court did not abuse its discretion in refusing to find that Lee engaged in domestic violence and in declining to impose restrictions.

B.       NO ERROR IN RESIDENTIAL SCHEDULE ORDER

Trial courts possess broad discretion when crafting a permanent parenting plan.  *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).  RCW 26.09.187(3)(a) provides multiple factors that the court must consider before adopting a plan:

>       (i)  The relative strength, nature, and stability of the child's relationship with each parent;
>       (ii)  The agreements of the parties, provided they were entered into knowingly and voluntarily;
>       (iii)  Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
>       (iv)  The emotional needs and developmental level of the child;
>       (v)  The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
>       (vi)  The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
>       (vii)  Each parent's employment schedule, and shall make accommodations consistent with those schedules.
>       Factor (i) shall be given the greatest weight.

Reutov contends that the trial court abused its discretion in adopting an alternating week-on, week-off residential schedule after Z.F.R. reaches kindergarten.  Lee argues this schedule was not an abuse of discretion.  We agree with Lee.

### 1.     *Strength, nature, and stability*

The first factor requires the court to consider the relative strength, nature, and stability of the child's relationship with each parent.  RCW 26.09.187(3)(a)(i).  Testimony at trial undoubtedly showed that Reutov has a strong relationship with Z.F.R. and that Reutov is a good mother.  Lee provided minimal testimony in his direct examination about his relationship with Z.F.R.  He stated that he believed it was important for Z.F.R. to have a father in his life but did not directly attest to the strength, nature, and stability of their relationship.

Hansen testified that he has seen Lee with Z.F.R. approximately 10 times and believes that Lee is a loving father.  Cassandra testified that Lee is a loving, attentive, and caring father toward Z.F.R.  And finally, Berquist testified that Z.F.R. appears to be very happy while under the care of Lee.  Although Lee did not directly testify to the strength of his relationship with Z.F.R., those who have observed their relationship describe it as strong and healthy.

### 2.     *Past and future performance of parenting functions*

The third factor requires courts to consider "those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child."  RCW 26.09.004(2); *see also* RCW 26.09.187(3)(a)(iii).  Parenting functions include:

> (a) Maintaining a loving, stable, consistent, and nurturing relationship with the child;
>
> (b) Attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;
>
> (c) Attending to adequate education for the child, including remedial or other education essential to the best interests of the child;
>
> (d) Assisting the child in developing and maintaining appropriate interpersonal relationships;
>
> (e) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and
>
> (f) Providing for the financial support of the child.

RCW 26.09.004(2).

Reutov has taken on a majority of the parenting duties since Z.F.R. was born. Lee had minimal presence for the first eight months of the child's life. When visitation was first ordered, Lee had two-hour visits a couple of days out of a month. At the time of trial, Lee was in the third phase of the temporary parenting plan, seeing Z.F.R. from Thursday at 9:00 a.m. to Sunday at 6:00 p.m. once per month.

At trial, Reutov expressed concern over Z.F.R.'s diet and diaper rashes originating from his visits with Lee. Regarding Z.F.R.'s diet, Reutov was concerned after learning that Z.F.R. only ate Cheetos while with Lee. Testimony revealed that Lee only had two-hour visits with Z.F.R. at the time, indicating that he did not bear a significant

responsibility in feeding Z.F.R.  Z.F.R. would also return to Reutov with severe diaper rashes, potentially as a result of Lee giving Z.F.R. too much fruit juice.

Lee's ability to provide financial support for the child is less clear.  Lee did not provide a copy of his 2022 tax return, but he indicated he was making his monthly payments toward child support backpay.  Lee also appeared to make an error in his financial declaration, showing that his expenses significantly exceeded his income.  However, Reutov does not argue that Lee is financially incapable of providing for Z.F.R.

### 3. Emotional needs and developmental level

Both parents testified that it is important to have a father in a child's life.  Reutov noted that when Z.F.R. returns from his visits with Lee, Z.F.R. acts very clingy.  Reutov noted that he has a difficult time staying on his nap schedule and that he does not like when Reutov leaves his sight.  Reutov believes Z.F.R. acts this way because he has been away from her for too long.

### 4. Z.F.R.'s relationship with other adults

Lee's wife, Cassandra, testified that both she and her children have a good relationship with Z.F.R.  Reutov's sister, Christina, also has a strong relationship with Z.F.R.  There was no testimony indicating that Z.F.R. has had a negative experience with any adults who reside with his parents.

17

### 5. *Wishes of the parents*

Reutov believes that it is important for children to have a father in their lives and that it is in Z.F.R.'s best interest to have a healthy relationship with his father. Reutov believes it is in Z.F.R.'s best interest to visit Lee every other weekend rather than on a week-on, week-off schedule. Lee believes that equal parenting with a close to a 50/50 split is in the best interest of Z.F.R.

### 6. *Employment schedules*

Reutov testified that she works approximately 40 hours per week and that she takes care of Z.F.R. while she works. When Reutov is unable to watch Z.F.R., Strand looks after him for roughly four hours per week. Lee's work schedule is less predictable as his hours are dependent on the type of work available at the time. However, he states that Cassandra will be able to look after Z.F.R. when he works during a busy season.

*Discussion of placement factors*

Based on the above factors, we conclude the trial court did not abuse its discretion in ordering a shared residential schedule beginning when Z.F.R. enters kindergarten. Testimony showed that Lee is a loving father who has a healthy relationship with Z.F.R. There are no allegations of Lee mistreating Z.F.R., and Lee's relationships with the children of his current wife are positive.

Reutov's concerns about Z.F.R.'s diaper rash do not warrant a different result. Testimony showed that Lee began feeding Z.F.R. other foods after Reutov expressed her concerns. Furthermore, there is no evidence that Z.F.R.'s diaper rashes remain a recurring issue following Lee and Reutov's discussion about Lee giving Z.F.R. too much fruit juice.

Reutov argues that Lee's increased residential time, when Z.F.R. enters kindergarten, constitutes a modification of the parenting plan, which requires evidence that the modification is in Z.F.R.'s best interest. We disagree. The "best interest of the child" standard applies to *modifications* of a parenting plan. RCW 26.09.260(1). Here, Lee's increased residential time with Z.F.R. is ordered in the parenting plan, not in a modification to that plan.

Both parties agreed it is important for Z.F.R. to have a father in his life. Lee wants to have a strong, close relationship with Z.F.R., and he—as well as Reutov—appear to be fit and loving parents. The trial court had a reasonable basis to order a shared residential schedule beginning when Z.F.R. enters kindergarten.

No. 40297-5-III
*In re Parenting & Support of Z.F.R.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Fearing, J.                              Murphy, J.

20